# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| JAMES L. WARD, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Case No.: 1:12-CV-1749-VEH** |
| | ) |
| UNITED PARCEL SERVICE, | ) |
| RUSSELL HAMRAC, and RON | ) |
| HEADLEY, | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

### A.    Procedural History

Plaintiff James L. Ward ("Mr. Ward") initiated this job discrimination lawsuit against Defendants United Parcel Service ("UPS"), Russell Hamrac ("Mr. Hamrac"), and Ron Headley ("Mr. Headley"), arising under the Americans with Disabilities Act (the "ADA"), as amended in 2008 by the ADA Amendments Act (the "ADAA"),[1] the

---

[1]    Based upon the absence of any briefing on the issue, evidently there is no disagreement that the ADAA applies to this lawsuit. The parties' apparent stipulation over which law to apply is also consistent with the court's prior ADAA retroactivity analysis, as the alleged disability-related discriminatory conduct that Mr. Ward complains about took place after January 1, 2009. This court has previously concluded that in the context of a plaintiff, such as Mr. Ward, who seeks monetary

Uniformed Services Employment and Reemployment Rights Act of 1994 (the "USERRA"), and state law on May 1, 2012.  (Doc. 1 at 1 ¶ 1).  Mr. Ward amended his complaint on September 2, 2012.  (Doc. 17).

Pending before the court is Defendants' Motion for Summary Judgment (Doc. 30) (the "Motion") filed on August 1, 2013.  The parties have supported and opposed the Motion (Docs. 31, 32, 35, 37), and it is now ready for disposition.  For the reasons explained below, the Motion is due to be granted in part and otherwise termed as moot.

### B.    Summary of Mr. Ward's Claims

Mr. Ward's amended complaint lists five separate causes of action.  (Doc. 17 at 6-10 ¶¶ 24-46).  The first count asserts violations of USERRA against UPS, Mr. Hamrac, and Mr. Headley.  (*Id.* ¶¶ 24-26).  The second cause of action alleges reasonable accommodation and adverse action claims against UPS under the ADAA.  Mr. Ward's third count is brought against UPS, Mr. Hamrac, and Mr. Headley for the

---

damages for disability discrimination premised upon an adverse employment action that occurred <u>prior</u> to January 1, 2009, the [ADAA] should <u>not</u> be applied retroactively.  *See generally Richardson v. Honda Mfg. of Ala., LLC*, 635 F. Supp. 2d 1261, 1269-72 (N.D. Ala. 2009) (analyzing whether to apply ADAA retroactively to challenged conduct pre-dating January 1, 2009).  Relying upon *Richardson* as persuasive authority and applying its retroactivity ruling conversely to the discriminatory time frame implicated here, the court will analyze the Motion and Mr. Ward's disability claims under the ADAA.

intentional infliction of emotional distress.  The fourth claim is for negligent and/or malicious retention, supervision, and training and is asserted against UPS.  Mr. Ward's final count asserts invasion of privacy against all three defendants.

The court's summary of the claims contained in Mr. Ward's amended complaint is consistent with the parties' briefing on summary judgment.  Further, to the extent that some other arguable claim exists in his amended pleading,  by virtue of his opposition brief's silence, Mr. Ward has abandoned it on summary judgment. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller Int'l, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("We decline to exercise our discretion to entertain this argument which was not fairly presented to the district court."); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Hudson v. Norfolk S. Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."); *cf. Road Sprinkler Fitters Local Union No. 669 v. Indep.  Sprinkler*

3

*Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint).

Conversely, to the extent that Mr. Ward's brief contains arguments about a claim that has not been pled in his amended pleading, it is similarly subject to summary judgment.   The Eleventh Circuit has made it unmistakably clear that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). *Gilmour* dealt with a plaintiff who was attempting to assert a new claim at the summary judgment stage. *Gilmour*, 382 F.3d at 1314-15.

Additionally, a more recent decision by the Eleventh Circuit cites to *Gilmour* and confirms that a district court's consideration of <u>any critical amendment</u> asserted merely as part of the briefing process is disfavored.[2]

The current practice in some district courts—especially in the

---

[2] *But cf. Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337, 1351 (11th Cir. 2007) (Hull, J.) (holding that district court abused its discretion by precluding at trial evidence and argument proffered by defendant on unplead affirmative defense).

summary judgment setting—is to ignore what the respective parties alleged in their complaint and answer and to consider their claims and defenses as depicted in the memoranda they filed in support of or in opposition to a motion for summary judgment. As is the situation here, the claims and defenses presented in the memoranda supporting or opposing summary judgment are not presented in the complaint and answer with the specificity required by the Federal Rules of Civil Procedure and the Supreme Court's decisions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); rather, they are presented in a shorthand fashion. The result is that on appeal we have difficulty in determining whether the district court, in granting summary judgment, ruled on the claims and defenses as stated in the complaint and answer or as stated in the memoranda submitted to the court on summary judgment, as if the pleadings had been amended by implied consent.

We encountered this dilemma most recently in *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S. Ct. 856, 184 L. Ed.2 d 656 (2013). There, in their motion for summary judgment, the plaintiffs sought to eliminate a critical deficiency in the allegations of their amended complaint by including additional facts. The defendants did not object to this tactic on the ground that the plaintiffs were, in effect, seeking to amend their complaint. And the district court, in ruling on the sufficiency of the complaint, appeared to have considered the additional facts as if they had been alleged in the complaint. In affirming the district court's dismissal of the claim at issue, we refused to consider these additional facts, citing precedent that precludes a plaintiff from amending its complaint "through argument at the summary judgment phase of proceedings." *Id.* at 1258 n. 27. "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

This court's precedent foreclosed Well–Come's attempt to amend its complaint at the summary judgment stage without seeking leave of

court pursuant to Rule 15(a)(2). Accordingly, the District Court should
have disposed of Well–Come's claim with a statement that Well–Come
failed to establish that ASRRG and ASIS issued a commercial general
liability policy and excess/umbrella liability policy to Flintlock LLC, as
alleged in paragraphs 6 and 7 of its complaint. We affirm the court's
judgment on that ground. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231,
1234 (11th Cir.2010) ("This court may affirm a decision of the district
court on any ground supported by the record.").

*Flintlock Const. Services, LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227-28

(11th Cir. 2013) (emphasis added).

## II.   FACTUAL BACKGROUND[3]

Mr. Ward began his employment with UPS, a company engaged in the package

delivery business, on September 20, 1988. AF No. 1.[4]   Throughout his employment,

---

[3]   Keeping in mind that when deciding a motion for summary judgment the
court must view the evidence and all factual inferences in the light most favorable to
the party opposing the motion, the court provides the following statement of facts.
*See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241
(11th Cir. 2007) (observing that, in connection with summary judgment, a court must
review all facts and inferences in a light most favorable to the non-moving party).
This statement does not represent actual findings of fact. *See In re Celotex Corp.*,
487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement
simply to place the court's legal analysis in the context of this particular case or
controversy.

[4]   The designation "AF" stands for admitted fact and indicates a fact offered by
UPS that Mr. Ward has admitted in his written submissions on summary judgment,
in his deposition testimony, or by virtue of any other evidence offered in support of
his case. Under appendix II of the court's uniform initial order (Doc. 2) entered on
May 2, 2012, "[a]ll statements of fact must be supported by specific reference to
evidentiary submissions." (*Id.* at 16). For Mr. Ward, more specifically, this means
that "[a]ny statements of fact that are disputed by the non-moving party must be

Mr. Ward has worked exclusively at UPS's Anniston, Alabama Center in hourly positions that are covered by a collective bargaining agreement between UPS and the International Brotherhood of Teamsters (the "CBA").  AF No. 2.

Mr. Ward is a member of the Teamsters Union.  AF No. 3.1.  The terms and conditions of Mr. Ward's employment at UPS are governed by the CBA.  AF No. 3.2. Mr. Ward first held the part-time position of Preloader and worked in that capacity until he was promoted to the full-time position of Package Car Driver in 1995.  AF No. 4.

Mr. Ward joined the Army Reserve in 1981 and, in July 2003, while he held the position of Package Car Driver, he was called to active duty.  AF No. 5.  Mr.

---

followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17).  Consequently, whenever Mr. Ward, without referring to any evidence (*see, e.g.,* Doc. 35 at 6 ¶ 50 ("Cannot admit or deny as Plaintiff has no personal knowledge of this medical evidence."); *id.* at 8 ¶ 86 (same)), has inadequately asserted a dispute over a fact that UPS has otherwise substantiated with an evidentiary citation, the court has reviewed the cited evidence and, if it in fact fairly supports UPS's factual assertion, has accepted UPS's fact.  On the other hand, whenever Mr. Bowen has adequately disputed a fact offered by UPS, the court has reviewed the evidence cited by Mr. Ward and, if it in fact fairly supports Mr. Ward's factual assertion, has accepted Mr. Ward's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of UPS's statement of undisputed facts as set forth in Doc. 31 and responded to by Mr. Ward in Doc. 35. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 3.2) indicates that the second sentence of paragraph 3 of UPS's statement of undisputed facts is the subject of the court's citation to the record.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

Ward was deployed to Iraq and remained on active status until the summer of 2005. AF No. 6.

In late July, 2005, Mr. Ward returned to UPS and requested to be reemployed. AF No. 7.  Mr. Ward informed UPS that, while he was on active military service, he suffered an injury to his leg and, as a consequence, was subject to medical restrictions that impacted upon his ability to work.  AF No. 8.  Mr. Ward further advised UPS that he could not return to his former position as a Package Car Driver.  AF No. 9.

The essential job functions of Mr. Ward's former position as a Package Car Driver required the ability to lift up to 70 pounds and to move packages weighing up to 150 pounds.  AF No. 10.  UPS sought to clarify the scope of Mr. Ward's medical restrictions and, in connection therewith, Mr. Ward arranged for his physician at the Veterans Administration, Mike Moates, M.D. ("Dr. Moates"), to complete certain forms provided by UPS.  AF No. 11.

Dr. Moates completed the forms provided by UPS and indicated that Mr. Ward could not perform all of the physical and mental functions of his position held immediately prior to his military deployment.   AF No. 12.   More precisely, Dr. Moates stated that Mr. Ward could not lift packages up to 70 pounds or move packages up to 150 pounds.  AF No. 13.

The essential job functions of the majority of the hourly union jobs at the

Anniston Center require that an employee be able to lift packages weighing up to 70 pounds or assist in the movement of packages weighing up to 150 pounds.  AF No. 14.

In 2005, with the exception of Package Car Driver positions, the only full-time position for a union employee at the Anniston Center was a position occupied by Carol Eddy, a union employee with more seniority than Mr. Ward.  AF No. 15.  That position consisted of a combination of Operations Clerk and Porter duties.  AF No. 16.  Because Mr. Ward could not perform the essential job functions of any full-time union job at the Anniston Center, UPS was not able to return him to work in a position with hours comparable to his prior employment, when he first requested reemployment in 2005.  AF No. 18.  UPS offered Mr. Ward the opportunity to work a part-time job performing "small sort" functions which did not require lifting beyond his medical limits, but Mr. Ward rejected the offer because he desired to be reinstated to full-time status at UPS.  AF No. 19.

Mr. Ward filed a complaint with the U.S. Department of Labor in 2005, alleging that UPS violated his rights under USERRA by failing to return him to work in a full-time position upon his return from military deployment.  AF No. 20.  UPS denied that it had failed to comply with its obligations under USERRA and responded that it was attempting to return Mr. Ward to work, but his medical restrictions

precluded him from performing the essential job functions of the full-time union jobs at his Center.  AF No. 21.

Ultimately, Mr. Ward's medical condition improved and his physician determined that he could perform the duties of the Operations Clerk/Porter position which had been occupied by Mr. Ward's senior co-worker, Carol Eddy ("Ms. Eddy."). AF No. 22.  The union jobs at the Anniston Center are awarded based on seniority under the CBA and Ms. Eddy was more senior than Mr. Ward.  AF No. 23.  Ms. Eddy was a member of the National Guard and, like Mr. Ward before, she was called up to duty in late spring 2006.  AF No. 24.

Mr. Ward requested to be placed in Ms. Eddy's bid job while she was on deployment.  AF No. 25.  UPS placed Mr. Ward in Ms. Eddy's position in June 2006 after his doctor cleared him to lift up to 70 pounds.  AF No. 26.  Thereafter, UPS and Mr. Ward fully resolved any remaining USERRA claims he may have had by entering into a Settlement and Release Agreement which Mr. Ward signed on Sept. 12, 2007. AF No. 27.1.

Mr. Ward occupied Ms. Eddy's position, performing the duties of an Operations Clerk and Porter without incident from June 2006 until February 2007. AF No. 28.1.  On February 19, 2007, however, he reported to UPS that he had suffered an on the job injury to his back.  AF No. 28.2.  As a result of his work-

related back injury, which involved a bulging disc, Mr. Ward was placed on medical restrictions again and was out of work on workers compensation for an extended period.  AF No. 29.

According to the results of a Functional Capacities Examination ("FCE") that was administered on November 2, 2007, Mr. Ward had a maximum lifting capacity floor to waist of 40 pounds and waist to overhead of 35 pounds and maximum carrying capacity was 50 pounds.  AF No. 30.  Mr. Ward remained subject to medical restrictions, including a lifting restriction of 40 pounds attributable to a bulging disc, until March 11, 2008.  AF No. 31.

On March 11, 2008, following an examination by Anniston Orthopaedic Associates, Mr. Ward was released to go back to work lifting up to 70 pounds.  AF No. 32.  Because Ms. Eddy remained on active service, Mr. Ward returned to performing her bid job, a combination of Operations Clerk and Porter duties.  AF No. 33.

Thereafter, in October, 2009, Ms. Eddy returned from military leave and requested to be reinstated to her bid position.  AF No. 34.  UPS agreed to reinstate Ms. Eddy to the position because it is a union job and she had more seniority than Mr. Ward, plus she had a right to be reemployed in the position under USERRA.  AF No. 35.

Upon Ms. Eddy's return to work, UPS asked Mr. Ward if he would like to return to his former position as a Package Car Driver, but he told UPS that he could not because he could not qualify to drive due to pain medications he took and because of his injury.  AF No. 36.  In the month before Ms. Eddy's return to UPS, Mr. Ward went to the office of Anniston Orthopaedic Associates and reported that he "was having considerable ongoing problems with pain and stiffness in the back, and pain that radiate[d] in the buttock and thighs…" AF No. 37.  Mr. Ward asked his treating physician "if anything further could be done as this [was] causing a significant effect on his activities and quality of life."  AF No. 38.

On or about November 9, 2009, Mr. Ward submitted a "Request for Medical Information" form to UPS that had been completed by Thomas Wilson, M.D. ("Dr. Wilson") of Neurological Associates.  AF No. 41.  Dr. Wilson indicated in response to the questions on the form that Mr. Ward was currently subject to the same limitations as had been given him at the time of the FCE in 2007.   AF No. 43.  The 2007 FCE was the evaluation that limited Mr. Ward to lifting 40 pounds waist to floor and limited his maximum carrying capacity to 50 pounds.  AF No. 44.  UPS's Occupational Health Supervisor, Roger Burnett ("Mr. Burnett"), traveled to Anniston to meet with Mr. Ward to review his medical restrictions as part of an effort to identify a position that Mr. Ward could perform.  AF No. 45.

At the meeting, Mr. Ward completed an "Accommodation Checklist" in which he indicated that he would provide UPS information on his current limitations and condition by January 15, 2010.  AF No. 46.  On January 15, 2010, Mr. Ward provided Mr. Burnett a description of his limitations which stated that he was limited to a maximum floor to waist lift of 40 pounds and a maximum carrying capacity of 50 pounds.  AF No. 47.

UPS sent Mr. Ward a letter in early February 2010, requesting that he update his medical information by seeing Anniston Orthopaedic Associates for an examination at UPS's expense.  (Doc. 32-2 at 30);[5] (*see also* 32-6 at 3 ¶ 7).  Mr. Ward was then examined by Dr. Vandervoort of Anniston Orthopaedic Associates again on February 25, 2010.  AF No. 49.  Based on his examination of Mr. Ward, Dr. Vandervoort gave Mr. Ward a permanent 50 pound lifting restriction and a medium duty work classification.  AF No. 50.

Thereafter, UPS sent Mr. Ward a letter advising that the most recent medical information it had regarding his condition indicated that he was subject to a 50 pound lifting restriction.  AF No. 51.  By way of the same letter, UPS also addressed the efforts it had made to explore possible job accommodations for Mr. Ward, including

---

[5]  All page references to Doc. 32-2 correspond with the court's CM/ECF numbering system.

consideration of the accommodations he had specifically requested.  AF No. 52.  As UPS explained in this correspondence, the positions Mr. Ward had indicated he wanted as an accommodation either were not available because they were filled with union employees who had more seniority and/or because they required the ability to lift up to 70 pounds, which Mr. Ward was unable to do according to his current medical information.  AF No. 53.

As an alternative, UPS offered Mr. Ward a position in either Anniston or Roebuck performing what UPS refers to as "SPA" duties.  AF No. 54.  Mr. Ward rejected the offer to return to work performing SPA duties because he was only willing to return to work in a full-time role.  AF No. 55.  An employee performing SPA duties scans packages as they come down a belt and places labels on the packages that contain information about the destination and the package car on which they must be loaded.  AF No. 56.

Mr. Ward asked UPS to combine the SPA position on the a.m. shift with another open position on the p.m. shift, but UPS responded that it had no open positions that could be combined with the SPA duties that would be consistent with Mr. Ward's medical restrictions and informed Mr. Ward of same.   AF No. 57.  Mr. Ward admits that he is not aware of any part-time position that was open at the time that could have been combined with the SPA duties and that did not require lifting 70

pounds.  AF No. 58.

Eventually, Mr. Ward's condition improved and, on November 23, 2010, he went to see Dr. Vandervoort and requested that Dr. Vandervoort increase his lifting restriction to 70 pounds.  AF No. 59.  Dr. Vandervoort examined Mr. Ward and agreed to increase his lifting restriction to 70 pounds.  AF No. 60.  As soon as UPS received notice of the change in Mr. Ward's lifting restriction, Mr. Burnett sent Mr. Ward a letter scheduling him for another FCE in accordance with normal practice. AF No. 61.

Anniston Orthopaedic Associates conducted an FCE and released Mr. Ward to return to work at UPS on or about December 22, 2010.  AF No. 62.  At that point, because there still was no full-time position available, UPS offered Mr. Ward the opportunity to return to the Anniston Center, working two part-time jobs to comprise full-time employment.  AF No. 63.  Mr. Ward accepted the offer and returned to work at the beginning of 2011.  AF No. 64.  His duties consisted of working SPA in the morning and scanning and loading packages in the afternoon.  AF No. 65.

Mr. Ward worked in these capacities as a full-time employee until approximately August, 2011.  AF No. 66.1.  In or about August, 2011, Ms. Eddy ceased working at UPS and Mr. Ward again took over her position, performing a combination of Operations Clerk and Porter duties.  AF No. 66.2.  Mr. Ward has been

continuously employed by UPS in the combination Operations Clerk/Porter position since August, 2011.  AF No. 67.

While employed by UPS, Mr. Ward has filed two Charges of Discrimination with the EEOC.  AF No. 68.  By way of his first Charge filed on March 16, 2010, Mr. Ward complained that UPS had discriminated against him based on sex and disability.  AF No. 69.1. His complaint related to the period of time during which he did not work after Ms. Eddy returned from military leave and he was subject to a limitation and could not lift up to 70 pounds.  AF No. 69.2.

The EEOC issued Mr. Ward a Notice of Right to Sue on February 15, 2011, informing him that it was closing its file and was unable to conclude that the information obtained established a violation of the statutes at issue.  AF No. 70.  Mr. Ward did not file suit within 90 days following his receipt of the Notice of Right to Sue on his first Charge.  AF No. 71.

Mr. Ward filed a second Charge on June 7, 2011.  AF No. 72.1.  By way of his second Charge, Mr. Ward complained about a series of events that he testified are the basis of his claims against the individual defendants in this lawsuit, Mr. Hamrac and Mr. Headley, and his allegations of harassment and retaliation.  AF No. 72.2.

The events which were the subject of Mr. Ward's second Charge commenced on March 23, 2011.  AF No. 73.  On that day, Mr. Ward was experiencing difficulty

with his leg, including pain, and decided that he would go to Physicians Care, a medical practice, to be examined after work.  AF No. 74.

Mr. Ward's supervisor, Chris Borden, overheard Mr. Ward discussing with a coworker the fact that he was in pain and Mr. Borden asked him if he was okay.  AF No. 75.  Mr. Ward told Mr. Borden he was having pain and that he was going to see his doctor.  AF No. 76.  Mr. Borden asked Mr. Ward to call him after he saw his doctor and told Mr. Ward that it might be necessary for him to see a doctor affiliated with UPS.  AF No. 77.

Mr. Ward was seen at Physicians Care after work on March 23, 2011, at which time the doctor gave him two shots for pain and noted in his medical chart that Mr. Ward should elevate his leg and return to work on March 28, 2011.  AF No. 78.  That evening, Mr. Ward called Mr. Borden and, according to Mr. Ward, Mr. Borden told him he would need to see a company doctor before he returned to work.  AF No. 79.

Thereafter, Mr. Ward provided UPS with a note from Physician Care which indicated that Mr. Ward was seen on March 23, 2011, that he was under a doctor's care from "3/23 to 3/27/2011," and that he would be "back to work on March 28, 2011."  AF No. 80.  On Monday, March 28, 2011, Mr. Ward was seen by the company doctor,  who concurred with Mr. Ward's treating physician that he could return to work; Mr. Ward went back to work that same day.  AF No. 81.

Subsequently, Mr. Ward filed a grievance with his union, complaining that he was required to see the company doctor before he could return to work.  AF No. 82. A meeting was conducted on May 11, 2011, about Mr. Ward's grievance.  AF No. 83. At the meeting, Mr. Ward provided UPS with a revised version of the previously-submitted doctor's note from Physicians Care.  AF No. 84.

The revised version of the doctor's note that was presented by Mr. Ward on May 11, 2011, included the words "without restrictions," which language had not appeared on the original note.  AF No. 85.  The discrepancy between the two doctor's notes was recognized by UPS and, because there was concern that a violation of UPS's Honesty in Employment policies may have occurred, security for UPS looked into the matter.  AF No. 86.

Mr. Headley, Security Supervisor, oversaw UPS's efforts to follow-up with the doctor's office to confirm that the doctor's office had amended Mr. Ward's original work excuse.  AF No. 87.  The doctor's office reported that, while all notes relating to Mr. Ward's care are typically kept in his patient file, there was no record of a work excuse with the phrase "without restrictions."  AF No. 88.  Because this information conflicted with Mr. Ward's report that he obtained the work excuse from his doctor's office, Mr. Headley obtained a statement from Brooke Ingram ("Ms. Ingram"), the Clinic Supervisor who had signed Mr. Ward's original work excuse.  AF No. 89.

18

Ms. Ingram confirmed that the records of the doctor's office reflect that only one work excuse was provided to Mr. Ward and that it did not contain the words "without restrictions." AF No. 90. Based on the information obtained from the doctor's office, Mr. Headley reasonably believed that Mr. Ward had falsified the second work excuse. AF No. 91.

On May 17, 2011, Mr. Ward and his union representative were called to a meeting with Mr. Headley and Mr. Hamrac, the Anniston Center Manager. AF No. 92. Mr. Hamrac and Mr. Headley questioned Mr. Ward regarding the inconsistent work excuses he had submitted. AF No. 93.1. Absent a satisfactory explanation, Mr. Hamrac intended to advise Mr. Ward that he would be immediately discharged for dishonesty under the terms of the CBA with his union. AF No. 93.2.

At the meeting, Mr. Ward insisted that the second work excuse was provided by his doctor's office and, accordingly, Mr. Headley told Mr. Ward that UPS would contact the doctor's office again. AF No. 94. Mr. Ward contends that he was told that his employment was terminated during the meeting. AF No. 95.

UPS did not issue Mr. Ward a notice of discharge. AF No. 96. Instead, the next morning, May 28, 2011, Mr. Hamrac and Mr. Headley went to the doctor's office to inquire regarding the discrepancy in the notes and Mr. Ward's assertion that he was given the second note by an employee of the office. AF No. 97. Mr. Hamrac

and Mr. Headley recall that Mr. Ward also was there that same morning.  AF No. 98.

Mr. Ward did not speak to Mr. Hamrac or Mr. Headley and they did not speak to him when they saw each other on May 18, 2011.  AF No. 99.  Mr. Ward observed Mr. Hamrac and Mr. Headley approach the front desk and heard Mr. Headley say that he was there to see the representative of the clinic who had given him the earlier information regarding Mr. Ward.  AF No. 100.  Mr. Ward told the personnel in the office that, if they divulged any information to Mr. Hamrac and Mr. Headley, they would be violating the HIPAA.  AF No. 101.

Mr. Ward then went to the back of the clinic where records are kept and the employee of the office who had given him the revised version of the doctor's note stated that she was the one who put the words "without restrictions" on the medical note at his request.  AF No. 102.  As soon as the discrepancy in the two notes was cleared up, UPS attempted to contact Mr. Ward to call him back to work.  AF No. 103.

Mr. Ward testified that Mr. Hamrac called him immediately after he left the doctors' office, but he did not speak to him until he received a letter from UPS telling him he needed to report to work.  AF No. 104.1.  Mr. Ward's union steward had also told Mr. Ward that UPS was trying to reach him to call him back to work.   AF No. 104.2.  At that point, Mr. Ward called Mr. Hamrac, who confirmed that he had been

trying to reach Mr. Ward, and Mr. Hamrac asked him to return to work.  AF No. 105.

Mr. Ward then reported to work and remains a full-time employee of UPS at the present time.  AF No. 106.  Mr. Ward was paid for the two days he did not work after his May 17, 2011, meeting with Mr. Hamrac and Mr. Headley and before he returned to work.  AF No. 107.

The EEOC issued Mr. Ward a Notice of Right to Sue on his second Charge on February 2, 2012, informing him that it was unable to conclude that the information obtained established a violation of the statutes at issue and was closing its file.  AF No. 108.  Mr. Ward commenced this action within 90 days following his receipt of the February 2, 2012 Notice from the EEOC.  AF No. 109.

## III.   STANDARDS

### A.    Summary Judgment Generally

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Once the moving party has properly supported its motion for

summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

## B.    USERRA Rights

As the Eleventh Circuit has described the contours of USERRA:

> Congress enacted USERRA to prohibit employment discrimination on the basis of military service as well as to provide prompt reemployment to those individuals who engage in non-career service in the military. *See* 38 U.S.C. § 4301 (2002). Sections 4311 and 4312 of the USERRA provide separate and distinct statutory protections for service members. *See Wrigglesworth v. Brumbaugh*, 121 F. Supp. 2d 1126, 1134 (W.D. Mich. 2000). Section 4311 prohibits employers from discriminating against employees on the basis of military service and retaliating against individuals, whether service members or not, who testify or give statements on behalf of a USERRA claimant. . . .

> Section 4312 addresses the right of reemployment for persons who serve in the military. Veteran reemployment statutes "date from the nation's first peacetime draft law, enacted in 1940." *Leib v. Georgia–Pacific Corp.*, 925 F.2d 240, 242 (8th Cir. 1991). Congress

intended for "[t]he statutory right to reinstatement ... to bolster the morale of those serving their country and to facilitate their reentry into the highly competitive world of job finding without the handicap of a long absence from work." *Id.* (quotation and citation omitted). Unlike section 4311, this provision does not require an employee to show any discriminatory animus.

*Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1234-35 (11th Cir. 2005).

As for disparate treatment claims arising under § 4311 more specifically:

Section 4311 clearly mandates proof of discriminatory motive. *See Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001); *Brandsasse v. City of Suffolk, Va.*, 72 F. Supp. 2d 608, 616–17 (E.D. Va. 1999). The standard of proof is the so-called "but for" test. *Sheehan*, 240 F.3d at 1013.

In order to establish his *prima facie* case, Coffman must show by a preponderance of the evidence that his protected status was a motivating factor in Chugach's decision not to hire him. *Brandsasse*, 72 F. Supp. 2d at 617. A motivating factor does not mean that it had to be the sole cause of the employment action. Instead, "it is one of the factors that 'a truthful employer would list if asked for the reasons for its decision.' " *Id.* (citation omitted); *see also Smith v. School Bd. of Polk County, Fla.*, 205 F. Supp. 2d 1308, 1314 (M.D. Fla. 2002). "Indeed, [m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Brandsasse*, 72 F. Supp. 2d at 617 (citation omitted); *see also Smith*, 205 F. Supp. 2d at 1314–15. Circumstantial evidence plays a critical part in these cases, "for discrimination is seldom open or notorious." *Sheehan*, 240 F.3d at 1014. The court can infer discriminatory motivation under the USERRA from a variety of considerations, such as:

proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the

> employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Id.* "When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Id.* This burden-shifting framework "applies to both so-called 'dual motive' cases and so-called 'pretext' cases." *Id.* "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." *Id.*

*Coffman*, 411 F.3d at 1238-39.

## C.   Disability Discrimination

### 1.   Failure to Accommodate Claim

In *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247 (11th Cir. 2007), the

Eleventh Circuit distinguished the framework for evaluating a failure to accommodate

claim from disparate treatment under the ADAA:

> Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees." 42 U.S.C. § 12112(a); *see also Earl*, 207 F.3d at 1365. "[T]he term 'discriminate' includes ... not making reasonable accommodations to the known physical ... limitations of an otherwise qualified individual with a disability who is an ... employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship

24

on the operation of the business ....” 42 U.S.C. § 12112(b)(5)(A). <u>Thus, an employer’s failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is “otherwise qualified,” and unless the employer can show undue hardship</u>. There is no additional burden on Holly to show that Clairson enforced its punctuality policy in a discriminatory manner by granting leniency under the policy to Holly's non-disabled co-workers while denying Holly the same leniency, nor any subsequent burdens on Clairson to show that it had “any legitimate non-discriminatory reasons for terminating Holly” or on Holly to “establish that these reasons were pretextual.”

*Holly*, 492 F.3d at 1262 (emphasis by underlining added).

Additionally, “the burden of identifying an accommodation that would allow a qualified individual to perform the job <u>rests with that individual</u>, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable.” *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (emphasis added) (citing *Willis v. Conopco*, 108 F.3d 282, 283 (11th Cir. 1997)).

## 2. Disparate Treatment Claim

Regarding establishment of disability discrimination premised upon disparate treatment under the ADA, the Eleventh Circuit has explained:

The ADA mandates that employers shall not discriminate against “a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.” 42

25

U.S.C. § 12112(a).  The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims. *See Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996). Thus, Hilburn has the burden of proving a *prima facie* case of disability discrimination by a preponderance of the evidence, which requires a demonstration that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability.  42 U.S.C. §§ 12112(a); *see Morisky v. Broward County,* 80 F.3d 445, 447-49 (11th Cir.1996). Having concluded that Hilburn had not established any genuine issue of a material fact relating to the first *prima facie* factor of disability, the trial court did not address the last two factors. *See Hilburn*, 17 F. Supp. 2d at 1383. Therefore, we will limit our discussion to whether Hilburn can be considered disabled within the meaning of the ADA.

The ADA defines a "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8). Additionally, Hilburn must establish that Murata had actual or constructive knowledge of the disability or considered her to be disabled. *Morisky*, 80 F.3d at 448.

The ADA defines a "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual;

(B) a record of such impairment; or

(C) being regarded as having such impairment.  42 U.S.C. § 12102(2).

Hilburn must be deemed to be "disabled" for purposes of the ADA if she satisfies any one of these three definitions. However, a physical impairment alone is not necessarily a disability under the ADA. *Pritchard*, 92 F.3d at 1132.  Commentary to the federal regulations contains a non-exclusive list of conditions that constitute a physical

impairment. For the purposes of Hilburn's personal disability claim, it is significant that heart disease is included in this listing. 45 C.F.R. pt. 84, App. A., subpart (A)(3) (1997). Courts, including the Eleventh Circuit Court of Appeals (Eleventh Circuit), frequently look to EEOC regulations to assess the next analytical step of determining whether a physical impairment substantially limits a major life activity. *See, e.g., Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

These regulations explain that the term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(I), (ii) (1997). Major life activities are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I) (1997). With respect to the major life activity of working, the regulations explain that the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(I) (1997).

*Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226-27 (11th Cir. 1999)

(footnote omitted) (emphasis added).

The ADAA broadens coverage under the ADA and provides in part that:

**(A)** The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

27

**(B)** The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

**(C)** An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

**(D)** An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(E)(I)** The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as–

> **(I)** medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;
>
> **(II)** use of assistive technology;
>
> **(III)** reasonable accommodations or auxiliary aids or services; or
>
> **(IV)** learned behavioral or adaptive neurological modifications.

42 U.S.C. § 12102(4)(A)-(E)(I).

The last stated purpose of the ADAA calls for a broadening of the term "substantially limits":

> **(6)** to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term 'substantially limits' as 'significantly

restricted' to be consistent with this Act, including the amendments made by this Act.

Pub. L. No. 110-325, 122 Stat. 3553, 3554 § 2(b)(6) (2008).

## IV.   ANALYSIS

### A.   Uncontested Claims

#### 1.   Mr. Ward does not contest the entry of summary judgment as to certain parts of his USERRA count.

By virtue of the parties' briefing on summary judgment, Mr. Ward has admitted that he and UPS have "fully resolved any remaining USERRA claims he may have had [on or before September 12, 2007,] by entering into a Settlement and Release Agreement which [Mr. Ward] signed on September 12, 2007." (*Compare* Doc. 31 at 7-8 ¶ 27 (describing details of 2007 USERRA settlement),[6] *with* Doc. 35 at 4 ¶ 27 (UPS's version of facts admitted by Mr. Ward)).[7]   Thus, the scope of Mr. Ward's USERRA count is limited to those claims accruing subsequent to September 12, 2007.

Further, Mr. Ward also has abandoned all USERRA claims asserted against Mr.

---

[6]   All page references to Doc. 31 correspond with the court's CM/ECF numbering system.

[7]   All page references to Doc. 35 correspond with the court's CM/ECF numbering system.

29

Headley and Mr. Hamrac personally, leaving only his post-September 2007 USERRA claims against UPS.  (*See* Doc. 35 at 28 n.6 ("Ward agrees that under the current state of the law[,] he cannot maintain a USERRA claim against the individual defendants.")).

**B.    Contested Claims**

    **1.    Summary judgment is appropriate regarding the remaining portions of Mr. Ward's USERRA count.**

        **a.    Discriminatory Failure to Accommodate**

Mr. Ward maintains that he has an actionable discriminatory failure to accommodate claim under USERRA for being "held out of work from October 2009 to January 2011" and "los[ing] 14 months of pay . . . ."  (Doc. 35 at 28).  More specifically, Mr. Ward contends that, subsequent to his initial reemployment with UPS upon completion of his military duty in 2006, UPS should have combined multiple part-time position(s) to provide him with compensation akin to a full-time employee as a reasonable accommodation to him, given his back-related lifting restrictions, in contravention of USERRA's anti-discrimination provisions.  (Doc. 35 at 27); (*see also id.* at 24 ("**Defendants Violated USERRA's Anti-Discrimination Provisions.**")).

In pursuing his USERRA discrimination claim under § 4311,[8] while Mr.

---

[8]  This type of USERRA violation is in contrast to a right to reemployment claim asserted under § 4312, which "provision does not require an employee to show any discriminatory animus." *Coffman*, 411 F.3d at 1235.  As the Fourth Circuit has summarized the discrete provisions of USERRA:

> In short, § 4312 requires an employer to rehire covered employees; <u>§ 4311 then operates to prevent employers from treating those employees differently after they are rehired</u>; and § 4316 prevents employers from summarily dismissing those employees for a limited period after they are rehired.  While combining to form comprehensive protection from the point of rehire to untimely dismissal, each provision is nonetheless functionally discrete.  As one court has noted,

>> <u>Section 4312 serves only to guarantee service persons' reemployment without question as to the employer's intent</u>. This interpretation is in keeping with congressional intent in enacting the USERRA. Finding existing veteran's right statutes overly complex and ambiguous, leaving veterans and employers confused as to their rights and responsibilities, Congress acted "to clarify, simplify, and where necessary, strengthen the existing veterans' employment and reemployment rights provisions." *Lapine v. Town of Wellesley*, 970 F. Supp. 55, 58, fn. 2. (D. Mass. 1997).  Section 4312 places service people and employers on notice that, upon returning from service, veterans are entitled to their previous positions of employment.  After being reemployed, the service person is protected by §§ 4316(c) and 4311.

*Jordan v. Air Prods. & Chems., Inc.*, 225 F. Supp. 2d 1206, 1208 (C.D. Cal. 2002).  Put more simply, <u>§ 4312 "only entitles a service person to immediate reemployment</u> and does not prevent the employer from terminating him the next day or even later the same day." *Id.*  The apparent harshness of this result is addressed by the fact that §§ 4311 and 4316 operate to protect the employee as soon as she is reemployed.

Ward acknowledges that he has the burden "to establish a *prima facie* case of discrimination under the statute" including producing proof "by a preponderance of the evidence that his military service or status was a motivating factor in the denial of an employment benefit" (Doc. 35 at 24), Mr. Ward fails to provide either direct or circumstantial evidence of discriminatory motivation or animus on the part of UPS in its treatment of him.  *See Sheehan v. Department of Navy*, 240 F.3d 1009,1014 (Fed. Cir. 2001) ("The factual question of discriminatory motivation or intent may be proven by either direct or circumstantial evidence.") (*Sheehan* cited with approval by the Eleventh Circuit in *Coffman*, *supra*).

First, Mr. Ward makes no attempt to establish direct evidence of UPS's improper motive under USERRA.  Second, Mr. Ward has failed to adduce admissible proof from which a reasonable jury could infer that a discriminatory animus motivated UPS in its treatment of him.  As set forth above, acceptable means by which a plaintiff meets this USERRA burden include evidence such as:

> [P]roximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work

*Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 304 (4th Cir. 2006) (emphasis added).

records or offenses.

*Sheehan*, 240 F.3d at 1014 (citing *W.F. Bolin Co. v. Nat'l Labor Relations Bd.*, 70 F.3d 863, 871 (6th Cir.1995)).

Here, Mr. Ward appears to rely upon the second foregoing factor: "A reasonable jury could find that UPS unreasonably failed to accommodate Ward when it held him out of work from October 2009 to January 2011, as there was an opportunity for him to combine two part-time jobs to make a full-time position." (Doc. 35 at 28). However, "[s]tatements by counsel in briefs are not evidence[,]" *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980),[9] and, in urging his position, Mr. Ward cites to no substantiating proof.

Moreover, Mr. Ward has factually conceded on summary judgment that there was no opportunity for him to combine two part-time jobs because, during the relevant time frame, UPS had no open positions that could be joined with the SPA duties to form full-time employment that would be consistent with Mr. Ward's medical restrictions. Further, Mr. Ward offers no other grounds to satisfy his initial burden. Accordingly, Mr. Ward's USERRA discrimination claim fails on a *prima facie* basis.

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Alternatively, to the extent that Mr. Ward has met his initial USERRA burden and demonstrated that his military status was at least a motivating factor behind UPS's treatment of him, UPS has affirmatively shown the existence of legitimate reasons which, "standing alone"[10], explain why he was not offered the option of combining two part-time positions—the lack of available jobs which Mr. Ward could perform given the undisputed medical restrictions on the amount of weight he was able to lift that remained in place until his improved medical status was confirmed by UPS in December 2010.

Therefore, the Motion is due to be granted on the discrimination portion of Mr. Ward's USERRA count.

### b.    Retaliation

In support of his USERRA retaliation claim, Mr. Ward merely observes in a footnote that "[a] reasonable jury could also find that UPS treated Ward in this manner in reprisal for him filing a complaint against them with the Department of Labor in 2006."  (Doc. 35 at 28 n.5 (citing 38 U.S.C.A. § 4311(b)).   Other than generally referencing the subsection of USERRA that prohibits retaliation, Mr. Ward points to no supportive legal authorities.

The court is not obligated to consider such an undeveloped argument.  *Cf.*

---

[10] *Coffman*, 411 F.3d at 1239.

*Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

Furthermore, Mr. Ward's purported retaliation claim is flawed for the same reasons that invalidate his USERRA discrimination claim–Mr. Ward has failed to adduce admissible proof from which a reasonable jury could infer that a retaliatory animus motivated UPS in its treatment of him,[11] and UPS has affirmatively shown

---

[11] The court notes that, to the extent that Mr. Ward premises satisfaction of this element solely upon his 2006 USERRA filing, the elapse in time between that date and any alleged retaliatory conduct on the part of UPS is simply too great for a reasonable jury to circumstantially conclude that UPS was motivated by retaliation. As the Supreme Court has articulated in a Title VII retaliation case:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001). *See, e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3–month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–1175 (C.A.7 1992) 4–month period insufficient). <u>Action taken (as here) 20 months later suggests, by itself, no causality at all</u>.

*Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (emphasis added).

that it would have treated Mr. Ward in the same manner, regardless of any retaliatory animus on its part.

Therefore, the Motion is due to be granted on the retaliation portion of Mr. Ward's USERRA count.

> **2.    Summary judgment is also appropriate on Mr. Ward's ADAA count**.

> **a.    Mr. Ward's Failure to Accommodate Claims**

UPS contends that Mr. Ward cannot pursue a failure to accommodate claim because any such claim is either time-barred as measured by the conclusion of his first Charge on February 15, 2011, or administratively precluded due to the absence of any failure to accommodate claim contained in his second Charge. (Doc. 31 at 28); *see* 42 U.S.C. § 2000e-5(f)(1) (setting forth  ninety day requirement to file a civil action upon receipt of notice of right to sue); *see also Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970) ("[I]t is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."); *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989) ("Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." (citing *Ray*

*v. Freeman*, 626 F.2d 439, 443 (5th Cir. 1980)).  The court agrees with UPS.

As UPS more specifically maintains:

> It is well-established that an individual seeking relief from alleged employment discrimination under the ADA must file suit within 90 days of receipt of a notice of right-to-sue letter issued by the EEOC. 42 U.S.C. § 2000e-5(f)(1); *see also Ellis v. Wal-Mart Stores, Inc.*, 952 F. Supp. 1513, 1519 (M.D. Ala. 1996) ("Before a court may hear a Title VII [or ADA] lawsuit, an aggrieved employee must . . . timely institute a lawsuit within ninety days after receiving a right-to-sue letter." (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973))). Plaintiff filed an EEOC charge on March 16, 2010 in which he alleged that UPS discriminated against him on the basis of his sex and purported disability in October 2009 by reinstating Carol Eddy to the position occupied by Plaintiff while Ms. Eddy was on active military duty and allegedly failing to return Plaintiff to work.  <u>The EEOC issued a no-cause determination and notice of right to sue concerning the Charge on February 15, 2011.  Plaintiff did not file the instant lawsuit until May 1, 2012, nearly 12 months after his 90 day limitations period expired. Plaintiff did not file any other Charge of Discrimination complaining about an alleged failure to accommodate him under the ADA</u>. Therefore, Plaintiff is barred from asserting claims under the ADA based on UPS's alleged failure to return Plaintiff to work or to provide Plaintiff a reasonable accommodation.

(Doc. 31 at 28-29 (citations to record omitted) (emphasis added)).

Mr. Ward attempts to salvage his reasonable accommodation claim by suggesting that the court should construe it as arising under a continuing violation framework for the time period spanning from October 2009 to May 2011.  (Doc. 35 at 29).  The court rejects Mr. Ward's position for at least four reasons.

First, neither one of the Charges filed by Mr. Ward marks the box that UPS has

engaged in a "CONTINUING ACTION" against him.  (Doc. 32-3 at 7; Doc. 32-3 at 29).[12]   Second, while Mr. Ward's first Charge expressly asserts "reasonable accommodation" in describing the "PARTICULARS" of his claims, his second Charge lacks any similar terminology and sounds only in disparate treatment, which is a different type of discrimination claim under the ADAA.  (*Compare* Doc. 32-3 at 7, *with* Doc. 32-3 at 29); *compare Holly*, 492 F.3d at 1262 ("The district court's implication that Holly was required to prove disparate treatment reflects, we believe, a misunderstanding of the fundamental nature of a reasonable accommodation claim under the ADA."), *with id.*  ("Thus, an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship.") (emphasis in original).

Third, the sole legal authority upon which Mr. Ward relies in support of his contention, *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792 (11th Cir. 1992), is a disparate <u>impact</u> case, which challenges the legality of a facially neutral policy that has alleged cumulative discriminatory effects on a protected class, and Mr. Ward has made no effort to explain why *Beavers* means that a continuing violation theory

---

[12]   All page references to Doc. 32-3 correspond with the court's CM/ECF numbering system.

should apply equally to alleged discrete acts of disability discrimination. (Doc. 35 at 29). Fourth, the cases and analysis referenced by UPS in its reply confirm that a continuing violation theory is simply inapplicable in this instance, and that Mr. Ward is without a viable reasonable accommodation claim on account of untimeliness and/or administrative exhaustion. (Doc. 37 at 11-13).

Accordingly, the Motion is due to be granted on Mr. Ward's reasonable accommodation claims contained in his ADAA count.

### b.   Mr. Ward's Disparate Treatment Claims

The formulations of Mr. Ward's ADAA disparate treatment claims are not entirely clear to the court. (Doc. 35 at 30-37). In particular, in what appears to be the ADAA disparate treatment section of his brief, Mr. Ward reasserts his complaint about UPS's alleged denial of a reasonable accommodation to him on January 15, 2010, and then immediately jumps to a criticism of UPS's discriminatory treatment of him from March 23, 2011, to May 17, 2011. (Doc. 35 at 34).

To the extent that Mr. Ward seeks to assert disparate treatment relating to UPS's conduct on January 15, 2010, then such a claim is time-barred consistent with the court's analysis of his reasonable accommodation claims set forth above. Additionally, summary judgment is appropriate because Mr. Ward's one-paragraph

approach makes no effort to substantiate how he has met any of the *prima facie* elements of an ADAA disparate treatment claim based upon this January 2010 occurrence and critically omits any citation to underlying evidence from which a reasonable jury could conclude that he was subjected to unlawful discrimination because of his disability and/or perceived disability.

As for Mr. Ward's complaints about any disparate treatment from March 23, 2011, to May 17, 2011, which time period is administratively covered by his second Charge, such challenged conduct is, still, nonetheless, inactionable for other reasons. One flaw is that Mr. Ward has not shown the existence of an adverse employment action related to this time frame. *See Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) ("An ADA plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse.").

As the United States Supreme Court has summarized the meaning of a tangible employment action:

> The concept of a tangible employment action appears in numerous cases in the Courts of Appeals discussing claims involving race, age, and national origin discrimination, as well as sex discrimination. Without endorsing the specific results of those decisions, we think it prudent to import the concept of a tangible employment action for resolution of the vicarious liability issue we consider here. A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Compare Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (C.A.7 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"), *with Flaherty v. Gas Research Institute*, 31 F.3d 451, 456 (C.A.7 1994) (a "bruised ego" is not enough), *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 887 (C.A.6 1996) (demotion without change in pay, benefits, duties, or prestige insufficient), *and Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (C.A.8 1994) (reassignment to more inconvenient job insufficient).

When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. <u>A tangible employment action in most cases inflicts direct economic harm.</u>

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761-62, 118 S. Ct. 2257, 2268-69, 141 L. Ed. 2d 633 (1998) (emphasis added).

Here, Mr. Ward admits that his disputed "termination was rescinded" and that "he was paid for the time he missed." (Doc. 35 at 37). Then Mr. Ward unhelpfully cites solely to *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), and suggests that, despite the lack of any appreciable economic detriment endured by him, his ADAA disparate treatment claim is sufficient under the holding of that precedent. (Doc. 35 at 37).

However, *Burlington*'s "more relaxed" measure of what constitutes actionable conduct is applicable to retaliation claims only, not to alleged discriminatory

treatment. *See, e.g., Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008) ("If any doubt remained regarding the incorrectness of the district court's [retaliation] ruling—though we find none does—application of the decidedly more relaxed *Burlington* standard to the facts of this case must emphatically dispel it.").  Instead, "when defining the level of substantiality required for a Title VII discrimination claim [and, likewise, ADAA disparate treatment], [the Eleventh Circuit still] require[s] an employee to demonstrate she suffered 'a *serious and material* change in the terms, conditions, or privileges of employment' to show an adverse employment action." *Crawford*, 529 F.3d at 970-71 (emphasis added in *Crawford*) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)).  Mr. Ward has not and cannot meet this more demanding discrimination-related element of *prima facie* proof.

The court alternatively determines that Mr. Ward lacks evidence from which a reasonable jury could conclude that he was subjected to unlawful discrimination because of his disability and/or perceived disability and that he has abandoned any effort to demonstrate pretext.

Accordingly, the Motion is due to be granted on the disparate treatment part of Mr. Ward's ADAA count.

### 3.     The court declines to exercise supplemental jurisdiction over Mr. Ward's state law claims.

Mr. Ward premises this court's jurisdiction over his state law claims under 28

U.S.C. § 1367.  Section 1367 provides in relevant part:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties. . . .

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

>> (1) the claim raises a novel or complex issue of State law,

>> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

>> (3) the district court has dismissed all claims over which it has original jurisdiction, or

>> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(a), (c) (emphasis added).

Having determined that summary judgment is appropriate on all of Mr. Ward's

federal claims, the court declines to exercise supplemental jurisdiction over his state

law claims of intentional infliction of emotional distress, negligent and/or malicious

retention, supervision, and training, and invasion of privacy, consistent with its discretion to do so under § 1367(c)(1) and/or (3).

Accordingly, the state law portion of the Motion is due to be termed as moot, and all of Mr. Ward's state law claims are due to be dismissed without prejudice.

## V.   CONCLUSION

Therefore, the Motion is due to be granted on all of Mr. Ward's federal counts and termed as moot with respect to his remaining state law counts.  The court will enter a separate dismissal order consistent with this memorandum opinion.

**DONE** and **ORDERED** this the 16th day of December, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

44